LYDIA DUMONT *v.* WINFIELD I. CROMIE.

February Term, 1925.

Present: WATSON, C. J., POWERS, TAYLOR, SLACK, and BUTLER, JJ.

Opinion filed October 16, 1925.

*View of Evidence on Motion for Directed Verdict—Duty of Driver About to Pass Another Coming in Opposite Direction —Negligence—Jury Question—Presumption That Law of Road Will Be Obeyed—Contributory Negligence—Inadequate Briefing—Servant, Not Bailee, Cannot Maintain Action for Injuries to Master's Property in Collision.*

1. On defendant's motion for directed veridct, evidence must be viewed most favorably to plaintiff.

2. In action of tort for personal injury sustained in collision, under

circumstances in case, *held* that defendant, while driving on highway with horse and wagon, having seen plaintiff coming with horse and buggy on highway from opposite direction, when plaintiff was more than 118 feet distant from place of accident, had duty of exercising due care to keep to right of center of traveled roadway, so they could pass without interference, and at not exceeding 20 miles per hour.

3. If defendant, after having such knowledge, failed to exercise requisite degree of care to keep to right of center of traveled roadway, and such failure was proximate cause of accident, it was negligence on his part for which he is liable.

4. In action of tort for personal injury sustained in collision, where evidence as to defendant's failure to keep to right of traveled part of highway when meeting plaintiff coming from opposite direction, was conflicting, question of negligence was for jury.

5. In such action, when each of parties saw team of other coming from opposite direction far enough apart to afford each ample time to move to right of center of road before two teams would meet, plaintiff had right to assume that defendant would observe law of road, and move his team to right of center and keep it there until two had passed without interference, and to act on such assumption until she saw, or in the circumstances ought to have seen, that it could not be true.

6. In such action, whether plaintiff was guilty of contributory negligence in failing to stop her horse at time when thereby she might have averted accident, *held* question for jury to determine under proper instructions from court.

7. Briefing is inadequate where nothing is said in brief beyond what was stated in taking exception.

8. Plaintiff injured in collision while driving team as mere servant of her father could not maintain action for damages to his wagon and harness.

ACTION OF TORT for negligence. Plea, general issue. Trial by jury at the March Term, 1922, Chittenden County, *Willcox*, J., presiding. Verdict and judgment for plaintiff. The defendant excepted. The opinion states the case. *Reversed, and judgment for plaintiff covering personal injury only.*

*A. L. Sherman* and *Warren R. Austin* for defendant.

*Chas. F. Black* for the plaintiff.

14

WATSON, C. J.   This action, to recover damages resulting
from alleged negligence of the defendant, was brought in the
name of the plaintiff by next friend, she then being but seventeen
years of age, but on reaching the age of majority before the trial
in the court below, she assumed to herself the prosecution of the
suit.

At the close of the evidence defendant moved that a verdict
be directed in his favor, two assigned grounds being (1) that the
evidence does not show any negligence on the part of the defend-
ant, and (2) that the evidence shows negligence on the part of
the plaintiff, which contributed to the accident.   The motion
was overruled to which defendant excepted.   The grounds of the
motion will be considered in their order.

It appeared that the accident in question happened on
March 2, 1921, about eight o'clock in the morning, in the town of
Charlotte, on the main road leading from Charlotte Village,
known as the "Four Corners," westerly to Lake Champlain; that
the location of the accident was on a straight line of highway
extending from the crest of the hill at the village, to the crest
of the railway right of way at the crossing a little west of
Charlotte Depot; that the grade at the location of the accident
was quite near level, but at the railroad crossing, from which
the plaintiff approached, and at the hill, from which the defend-
ant approached, the land was somewhat higher than where the
accident occurred which was 118 feet easterly from the railroad
track; that at the time in question the plaintiff, driving a single
horse attached to an open buggy, was going in an easterly direc-
tion, and the defendant, driving a single horse attached to an
express wagon, was going in a westerly direction, over the same
highway; that the two wagons collided by the rim of the left
fore wheel of plaintiff's wagon and the hub of the left hind
wheel of defendant's wagon striking together, resulting in per-
sonal injuries to the plaintiff and damages to the buggy and
harness; that she had then been living with her parents on their
farm in Charlotte for about two years, aiding them in carrying
it on; that in so doing she milked the cows, helped in the haying
and about the threshing machine, and carried milk to the
creamery pretty nearly every day, and helped her mother around
the house; that on the morning of the accident she carried the
milk to the creamery as usual, leaving home around seven
o'clock; that the creamery was located on the west side of the

railroad track and south of the highway, running to the ''Four Corners,'' and in order for her to reach the creamery it was necessary to pass westerly along the main highway, cross the railroad track, and then turn to the left to the creamery; and that she was returning to her home over the same highway, in the opposite direction, when the collision took place; that from the railroad track easterly there was a ditch on the south side of the highway and running parallel with it; also a similar ditch though deeper on the north side; that the traveled roadway went practically to the edge of the ditch on each side; that the height of land at the railroad track was six to eight feet higher than in the highway where the accident happened; that at the place of the accident the traveled roadway between the two ditches was twenty-three feet wide, measured from the near edge of each ditch; that the roadway from the ''Four Corners'' to the creamery was a good one—well kept up, and straight from the railroad track to the ''Four Corners.''

[1]   The evidence bearing particularly on the questions of negligence by the defendant, and contributory negligence by the plaintiff, viewed in the light most favorable to the latter, as it must be in disposing of the motion for a verdict, fairly tended to show that the ditch on the south side of the highway leading easterly from the railroad crossing was four feet deep at a point fifteen or twenty feet east of the railroad, thence growing shallower to about two feet deep at the place of the accident; that the roadbed was somewhat muddy there the day before, but it froze in the night and was frozen—a kind of a crust—at the time of the collision; that the horse then being driven by the plaintiff was a farm horse owned by her father, and had worked both single and double for some years on the farm then owned and occupied by him; that the horse was kind and gentle, safe in anybody's hands, safe and easy for a woman to drive, lazy and not very swift, and had been much driven by the plaintiff during the preceding two years in carrying milk to the creamery; that when the plaintiff started for home from the creamery on the occasion in question her horse trotted until it approached the railroad track, but there came to a walk and walked over the crossing; that being over, the horse started at its ordinary trot— the trot of that horse being, according to the testimony of one witness, a jog or trot ''like any common farm horse''—and trotted slowly, ''about the same gait,'' to the place of the acci-

dent, and was so trotting at the time of the collision; that when passing over the railroad track the plaintiff saw the defendant's team coming, it then being further beyond the place of the accident than the plaintiff was near to that place, and that his horse was traveling faster than was her horse; that thus knowing defendant's team was coming, the plaintiff, as soon as she was over the crossing, began to guide her horse to the right of the center of the road, continuing gradually to bear to the right until her wagon was running so near the ditch that at the time and place of the collision, the track made by the right-hand wheels was within eight inches of the ditch; that the standard width of such wagons as the plaintiff and the defendant then had, is four feet and eight inches between wheels; that the defendant saw plaintiff's team when it came over the railroad track and continued to see it until the collision, during all which time, not conforming to the law of the road (G. L. 4705), he traveled in the center of the road and so far to the left of the center that, in order for the collision to take place as it did, the left hind wheel of his wagon must then have been running within approximately five and one-half feet of the ditch on his left-hand side of the traveled road which at that place was twenty-three feet wide.

[2-4]  It is asserted in defendant's brief that if he was driving his team at the left of the center, or on his left-hand side, of the road, he had a right so to do, and it was not negligence on his part.  Whatever might be said as to the soundness of such proposition where the circumstances are not such as to require the application of the law of the road as declared in G. L. 4705, it is not sound when applied to the circumstances of the present case where the law of the road was applicable and, in ruling the motion for a verdict, the evidence was to be given its aspect most favorable to the plaintiff.  Considering the evidence from such point of view, the defendant was more than 118 feet east of the place of collision when he first saw the plaintiff's team coming over the railroad crossing and knew that her team and his, moving in opposite directions over the highway, must soon meet. Knowing this, it was thenceforth his duty to exercise due care to keep to the right of the center of the traveled roadway, so the two teams could pass without interference, and at a rate of speed not exceeding twenty miles an hour.  G. L. 4705.  By the same section of the statute, a person who violates its provisions relating to the law of the road is subject to a penalty.  And if, within

the fair tendency of the evidence, viewed as required on this motion, the defendant, after having such knowledge, failed to exercise the requisite degree of care to keep to the right of the center of the traveled roadway, and such failure was a proximate cause of the accident, it was negligence on his part for which he is liable in this action, the case being otherwise made out. But the evidence in this respect was conflicting; and consequently the question of his negligence was one for the jury to determine.

Some of the evidence to which attention has been called as bearing on the question of negligence by the defendant, also had a bearing on the question of contributory negligence by the plaintiff, for instance, the ditch on the south side of the roadway from the railroad crossing to the place of the accident, the depth of the ditch, its nearness to the portion of the road upon which the plaintiff drove her horse after seeing defendant's team coming from the opposite direction, and the speed of the horse as driven. In addition, the following testimony, given by the plaintiff, was of much importance on the question of her negligence. "Q. How near to the ditch did you drive your horse? A. As close as I could go to it. Q. What next happened? A. What happened next he struck me with his team and I fell down. Q. How did you fall down? A. I fell on my head. Q. Where was Mr. Cromie driving in reference to the center of the road when you first saw him? A. About in the middle of the road. Q. Explain the course he took as he approached you, up to the time of the accident. A. I don't think he done anything, he kept his horse straight in the road from the time I first see him. Q. As he approached you did he slacken up the speed of his horse? A. I did not see him slack any. Q. And if he had done so would you have seen him? A. If he had got one side of the road I would have seen him. Q. Do you know just how the accident happened? A. He happened to come up to me and bumped one of my wheels, and I didn't remember anything after that. Q. Was your wagon over to the right of the road as far as you could get it at the time the accident happened? A. Just as close as I could be. Q. Why couldn't you pull further to the right? A. Because I would have dumped into the ditch." In cross-examination she testified: "Q. Did you see Mr. Cromie when you passed over the railroad track? A. Yes, sir. Q. And you saw him all the way from the track until the wagons came together, did you? A. I did not see him

until the time we struck together.  Q.  Did you see Mr. Cromie at all from the time you left the railroad track until the wheels came together?  A.  I did.  Q.  You saw him all the way along the road from the time you left the track until the wheels came together, did you not?  A.  No, sir.  Q.  Did you see him just before the wheels came together?  A.  I see him a little way before the wheels came together.  Q.  Were you looking at him at the time the wheels came together?  A.  No, sir.  Q. What were you looking at?  A.  I was looking not to fall into the ditch which I was so close to.  Q.  How near the edge of the ditch did you get?  A.  As near to it as I could.  * * *  Q. Was Mr. Cromie's horse walking or trotting?  A.  He was coming faster than I was—He must have been trotting because he was coming faster than I was.  Q.  Did you see his horse trotting?  A.  I don't remember that, but he was coming along fast.  Q.  You was not noticing Mr. Cromie very well, were you?  A.  I see him before he arrived.  Q.  You saw no reason why you could not pass his wagon, did you?  A.  I could not go by unless I fell into the ditch.  Q.  Did you try to stop your horse?  A.  I didn't have the time because he was right up on top of me.  * * *  Q.  Did you try to make your horse go slower at any time?  A.  No, sir, because he was always going the same gait.  Q.  Did you try to stop the horse from trotting when you see you could not go by without going into the ditch?  A.  I didn't have time because it all happened right away.  * * * Q.  You saw Mr. Cromie's horse turning to the right and that he was going to get out of your way, didn't you?  A.  No, sir. Q.  Why didn't you slack up your horse?  A.  Because he was so far away from me I thought he was going to give me the right of the road.''

[5, 6]  On the evidence, viewed as was required on the motion for a verdict, each of the parties saw the team of the other coming from the opposite direction, when they were far enough apart to afford each ample time to move to the right of the center of the road before the two teams would meet, and the plaintiff had the right to assume that the defendant would observe the law of the road, and move his team to the right of the center and keep it there until the two had passed without interference.  The law allowed her to go on such assumption until she saw, or in the circumstances ought to have seen, that it would not be true.  *Hatch* v. *Daniels*, 96 Vt. 89, 117 Atl. 105.  For

some distance before, and at the time of, the collision, the plaintiff was driving her team as near as she could to the ditch along her right-hand side of the roadway—the wheels on that side of her wagon were running within eight inches of the open ditch which was two feet deep. Because her attention was necessarily engaged in avoiding the imminent danger of getting into the ditch, she did not notice the nearness of defendant's team to that side of the roadway just before the wagons came together and when, had she noticed such nearness, she might have stopped her horse and averted the accident. In this respect she was bound to exercise the care and prudence of a prudent man in a like situation. If what she did measured up to this standard—the evidence was not all one way—she was not therein guilty of contributory negligence, and the question of such negligence was for the jury to determine under proper instructions from the court. *Benedict* v. *Union Agricultural Society*, 74 Vt. 91, 52 Atl. 110; *Lee* v. *Donnelly*, 95 Vt. 121, 113 Atl. 542; *Wood* v. *Central Vt. Ry. Co.*, 89 Vt. 321, 95 Atl. 641; *Aiken* v. *Metcalf*, 90 Vt. 196, 97 Atl. 669; *Sharby* v. *Town of Fletcher*, 98 Vt. 273, 127 Atl. 300.

[7] The exceptions to the charge, so far as relied upon, are not adequately briefed, nothing being said in the brief beyond what was stated in taking them. *McAllister* v. *Benjamin*, 96 Vt. 475, 121 Atl. 263; *McClary* v. *Hubbard*, 97 Vt. 222, 122 Atl. 469. The same may be said regarding the questions raised by the motion to set aside the verdict, (quoting from the brief,) "which is in the files and is hereby referred to and relied on, and is a part of the bill of exceptions." This is no briefing at all.

[8] Defendant excepted to the court's submitting to the jury the question of damage to the wagon and harness. This exception must be sustained. At the time in question the plaintiff was acting as a mere servant of her father who owned the team she was driving, and she was using it in and about his business. In law the team was not in her possession, but in the possession of the father. She was in no sense a bailee, and had no special property in it. Consequently she could maintain no action for damages to the wagon and harness. Dicey Part. Marg., p. 358; 2 C. J. 831. Two verdicts were returned by the jury in favor of the plaintiff: One to recover $762 as damages for personal injuries; and one to recover $18 as damages to the wagon

and harness.    The latter is therefore separable from the former, and the judgment will be reduced accordingly.

*Judgment reversed and judgment for plaintiff to recover the sum of $762.00 with interest thereon during stay of execution, and costs of suit.*